## S. E. LANE v. THE STATE.

*No. 3635.    Decided December 17.*

1. **Jury Law.—A Householder**, within the meaning of the law, is a person who, whether married or single, occupies a house and is the head or master of a family occupying the house with him. He is not a householder who merely occupies a room or house. It was shown that the impugned juror in this case who stated on his *voir dire* that he was a householder was a mere boarder and lodger in the private house of another. *Held*, that he was not a householder within the purview of the law, and was not a qualified juror.

2. **Same—New Trial—Disqualification of a Juror.**—That a juror who served on the trial was disqualified in fact is not a good ground for new trial unless it be made further to appear that the service on the jury of such a disqualified juror was calculated to and probably did injure the rights of the defendant. See the opinion for a showing of probable injury set out in the motion for new trial *held* insufficient.

3. **Same.** — Certain jurors stated on *voir dire* that they had formed opinions as to the guilt or innocence of the accused; that it would require evidence to overcome that formed opinion, but that they could fairly try the defendant upon the law and the evidence to be submitted to them. *Held*, that the jurors were qualified.

4. **Murder—Manslaughter—Charge of the Court.**—The only evidence on this trial which tended to raise the issue of "adequate cause"—an essential element of manslaughter—was that as to the insulting language and conduct of the deceased toward the defendant's betrothed. Upon this phase of the case the charge of the court (for which see the statement of the case) is *held* sufficient.

APPEAL from the District Court of the Fourteenth Judicial District of Dallas. Tried below before Hon. R. E. Burke.

This conviction was in the second degree for the murder of J. W. Wilson in Dallas County, Texas, on the 8th day of August, 1888. A term of five years in the penitentiary was the penalty assessed by the verdict.

The statement of facts in this case covers about 100 pages of a typewritten record, but for the purposes of this report a short summary will be sufficient.

The proof shows that Wilson was shot by Lane early on the afternoon of August 8, 1888, on the sidewalk in front of the side door of the News office, in Dallas, Texas. Two shots were fired by Lane. The first passed through the brim of Wilson's hat and powder-burned his face. The second took effect in the left hip, passed into the cavity of the stomach, and proved fatal on the second day after it was inflicted.

The first of the State's witnesses who claims to have seen the shooting testified, in substance, that he was east of and between twenty-five and forty feet distant from the place of the shooting at the time it occurred. His attention was attracted by the cry, "Look out!" He then saw Wilson on the sidewalk approaching the side door of the News office, and a man's hand and a few inches of a pistol protruding from that door. Instantly, almost, the pistol was discharged and Lane stepped out of the door and fired a second shot at Wilson, who stepped to the edge of the sidewalk and fell into the gutter. Soon afterward Lane handed his pistol to somebody arriving upon the scene and walked to where witness was and asked where he could find an officer to whom he could surrender. So far as the witness saw or heard, Wilson neither did nor said anything immediately preceding or at the time of the shooting. The first shot was fired from inside of the door, only the man's hand and pistol being visible from the outside.

Another eye-witness, testifying for the State, corroborated the testimony of the first witness, except that his attention was first attracted by the first shot. He did not see that shot fired from the inside of the door, but immediately after it was fired he saw the defendant step out of the door

toward Wilson and fire the second shot. He heard nothing said by any person, and did not see Wilson make any kind of a demonstration at the time of the firing of either shot.

Other State witnesses who heard but did not see the shots fired, and who saw Wilson as he staggered and fell off the sidewalk, testified that he, Wilson, was then making no hostile demonstrations. A third eye-witness, circumstantially corroborating the first, testified that Wilson was approaching the door with his hands hanging down by his sides and with his face turned from the door, and was looking towards the opposite side of the street when the man fired the first shot from the inside of the door. Wilson then turned to run, when defendant stepped out of the door and fired the second shot. No pistol or other weapon was found on the person of Wilson.

J. F. Hathaway testified for the State, in substance, that he was the proprietor of the Louisiana Hotel, on Patterson Avenue, in the city of Dallas. Wilson, his wife and child, the defendant, and a Miss Barbara Saunders were boarders at the witness's hotel on August 7, 1888. On that day, which was the day preceding the shooting, the defendant quit boarding at that hotel. He quit at the witness's request. On that morning the witness told Lane that complaints had been made to him by boarders in the house affecting the conduct or deportment of him, Lane, and Miss Saunders toward each other, and that it was necessary that he should change his boarding house in order to prevent the other boarders from leaving. Lane denied that he and Miss Saunders had been guilty of indiscretion, and asked the witness to give him the name of the person who made the complaint. The witness declined to do so upon the ground that he wanted no difficulty in the house, and told Lane that if he was not satisfied with what he felt inclined to tell him about the matter, then he, Lane, could hold him, witness, responsible. The witness then told Lane that, in his opinion, the reports had seriously compromised the young lady's reputation, and advised him that, as it was a known fact that he was engaged to marry her, it was best for him to procure a license and do so at once, in which event all the lady boarders in the house would sustain her. Lane replied to this suggestion that he would adopt another method of vindicating and sustaining the young lady's character. The witness regarded the defendant as an upright, honorable man. Defendant protested that nothing wrong had transpired between him and Miss Saunders, and the witness believed him. Wilson made no complaints to witness about Lane and Miss Saunders. If he, Wilson, came down-stairs after bedtime on the night of August 6, 1888, to hunt for the witness, the witness did not know it. In going from witness's house on Patterson Avenue to town a person would travel Griffin Street. A person standing at the corner of Pacific Avenue and Griffin Street could not see witness's hotel, but a person standing in the rear of Aldridge's printing house on Elm Street could see up Patterson Avenue.

Different witnesses for the State testified that at different times during the one or two hours immediately preceding the shooting they saw the defendant at different points on Pacific Avenue, Griffin Street, and in the rear of Aldridge's printing house. At this latter place he was in company with one Rodgers, an employe of Aldridge, who went off with him, and who, as disclosed by the defensive evidence, was subsequently a witness to the shooting.

The defendant's wife, *nee* Miss Barbara A. D. Saunders, testified for the defense that she was engaged to be married to the defendant at the time of the shooting. At that time she was a boarder at the Louisiana Hotel, at which hotel the defendant and the deceased and his family likewise boarded. The several parties mentioned occupied different rooms on the up-stairs floor of the said hotel. A window of the room occupied by the deceased and family opened upon a gallery, across which a hammock belonging to the defendant was stretched. The witness often reposed in that hammock, especially when tired or unwell, and it was a custom of the defendant when in the house to sit by the hammock when thus occupied by the witness and converse with her. On the evening of Monday, August 6, 1888, the witness, feeling quite unwell, got into the hammock, and was reclining therein at 6 o'clock when the guests went to supper, leaving her alone, the only person up-stairs. After awhile the deceased, leaving his family down-stairs, presumably at supper, came up-stairs, went into his room, took his position before the window, through which he looked upon the gallery for a few moments. He then came out on the gallery to the hammock where the witness was and asked her how she was feeling. She replied that she was then feeling somewhat better than earlier in the evening. Deceased then took witness's hand, felt her pulse, and remarked, "You have considerable fever yet, and you had better lie quiet." He then dropped her hand and turned as though to go back into his room. Instead, however, he seized the witness's ankle, and said to her: "You have a very pretty foot and ankle. Won't you let me take Mr. Lane's place? I may not be as young as Mr. Lane, but I consider myself as good, and can make myself quite as entertaining as he. Won't you let me come and stay with you to-night?" The witness at once sprang out of the hammock, ordered the deceased to leave, and told him that if he did not go she would call Mr. Lane. Indignant and mortified that she should be so needlessly insulted, the witness fell to weeping as she resumed her place in the hammock, and was still weeping when, a short time later, Mr. Lane joined her on the gallery. To his question as to why she was weeping, the witness, too much mortified to tell him at that time what had actually transpired, replied that she was unwell and hysterical, and that her supper had not yet been sent up to her. Lane then went off and brought the witness a supper from a neighboring restaurant, which she ate on the gallery, Lane remaining in her company.

Between 9 and 10 o'clock the deceased and his wife came up-stairs and went into their room. The window looking out upon the gallery was open and the blinds were up. Presently Lane said to witness, "It looks like he is going to undress without pulling down the blinds; you had better turn your head." A short period of silence was followed by the noise made by deceased in walking about in his room. Lane said to witness, "Somebody in there must be sick." A few minutes afterwards the deceased struck a match, which he held out of the window. He presently struck another, with which he lighted a lamp. He then placed the lamp on the floor and asked his wife, "Where is that pistol?" Witness did not hear Mrs. Wilson say anything in reply, but deceased opened a trunk which stood immediately under the window, took a pistol out of it, which pistol he put in his pocket. Much excitement was prevailing in Dallas at that time because of numerous recent burglaries. When he saw deceased get the pistol Lane said to witness, "Mr. Wilson may have seen a burglar; I will see if I can render him any assistance." He then stepped to the window and said to the deceased, "Mr. Wilson, can I be of any assistance to you? Have you seen any object prowling around." Deceased replied, "No, but I see some things going on here that I don't like." Wilson then got up, partly dressed, and went down-stairs with the lamp, returning after a short absence. Mr. and Mrs. Hathaway, Mr. and Mrs. Roberson, and Mr. and Mrs. Houston, were down-stairs at that time. This all occurred on the night of Monday, August 6.

On the evening of the next day, Tuesday, August 7, the defendant joined the witness on the gallery up-stairs, and was reading, when Mr. Hathaway came to the door and asked him for a private interview. When Lane rejoined the witness a few minutes later his expression of annoyance impelled the witness to ask him what was the matter. In reply he told the witness that Mr. Hathaway had just told him that reports of improper conduct on the part of himself, defendant, and witness were circulating through the house, and that because of such reports he, defendant, must change his boarding place; that he asked Mr. Hathaway to name the person who had told him of such rumors or reports, and that Hathaway refused to do so. Witness then told defendant that the author of those reports must be Wilson. She supplemented this statement by telling defendant nearly but not quite all of what transpired on the gallery between herself and Wilson on the previous night. She told him that Wilson asked her how she was feeling; that he then felt of her pulse; told her she still had fever and advised her to lie quiet; that he then seized her ankle and said to her: "You have a very pretty foot and ankle. Won't you let me take Mr. Lane's place? I may not be as young as Mr. Lane, but I consider myself as good, and can make myself quite as entertaining as he." She did not then tell Lane of Wilson's concluding request to be permitted to "stay" with her that night, nor did she tell Lane of this

specific request until after she became Lane's wife, which was subsequent to the killing. She felt then, as now, that Wilson's request to be allowed to take Lane's "place," coupled with his acts, implied all that was expressed in the direct request to stay with her that night. Defendant made no comment upon Wilson's conduct as related to him by witness, but merely said, "I will wait and see Mr. Wilson." He and witness remained on the gallery for some time waiting for Wilson to come up-stairs, but he was not seen on that evening or night. On the morning of that day—the day preceding the shooting—the witness saw Mrs. Hathaway, Mrs. Roberson, and Mrs. Wilson in the deceased's room. Mrs. Wilson was then weeping, to which fact the witness called the attention of Lane, who was then with her.

To avoid repetition, it may be here stated that this much of the testimony of this witness was fully corroborated by the testimony of the defendant in his own behalf. Concluding her testimony, Mrs. Lane stated that she saw Wilson when he left the Louisiana Hotel last before the shooting. It was about 1 o'clock p. m. when he left. As he passed out of the gate going toward town he waved his hand to somebody on the lower gallery and said, "I expect to have a case before the grand jury this evening."

The defense next read in evidence the deposition of Mrs. J. W. Wilson, the widow of the deceased. Its effect was to corroborate the statement of Mrs. Lane as to what occurred in the deceased's room after she and deceased entered it on Monday night, and while defendant and Mrs. Lane, then Miss Saunders, were on the gallery. Explaining the object of the deceased's said actions, Mrs. Wilson stated that, her health being bad, her husband secured the room occupied by them at the Louisiana Hotel because of its ventilation. Lane and Miss Saunders spent much of their time sitting in the hammock on the gallery, and on one occasion the witness saw Miss Saunders sitting on Lane in the hammock. In consequence of this practice on the part of Lane and Miss Saunders the witness had to keep her windows closed a great deal of the time. This annoyed the deceased. As he was about to retire on Monday night, at about 11 o'clock, the deceased said to witness: "Bettie, I actually believe those people are lying together out there in that hammock. I will give them a hint that it is bedtime." He thereupon walked past the window and blew out the light and came to bed. He then said to witness, "If these are the kind of characters they are going to keep in this house we will move out." The witness asked him how he was going to manage to leave the house without giving a reason, as he had expressed to the proprietors his satisfaction with the room and fare. He replied: "You know I am very particular never to accuse anybody without being certain. I will strike a light and be certain of the position they are in." He then got up, put on his pants, shirt, socks, and shoes, and struck the matches and lit the

lamp in the manner stated by Mrs. Lane.   To ascertain the position of Lane and Miss Saunders he tried to throw the light across the gallery, but failed to obtain the desired view.   He then went down-stairs with the lamp, saying that he would get Mr. Hathaway to make an investigation.   He soon returned, and reported that he could not find Hathaway. He then whispered to witness that in order to create a movement on the part of Lane and Miss Saunders, and thereby obtain a view of their position in the hammock, he would ask witness for her pistol loud enough for them to hear him.   The pistol transaction then transpired substantially as stated by Mrs. Lane, but it was after and not before the deceased went down-stairs.   In getting the pistol deceased looked out through the window, and presently said to witness, "I am satisfied now; I can swear to it."   About that time Lane asked, "What is the matter Mr. Wilson? Anything wrong in the yard?"   Deceased replied, "No, nothing wrong in the yard, but I see things going on in the house that I do not approve of."   The pistol referred to belonged to witness, and was in her trunk when her husband was shot.   Deceased owned no pistol, and if he had one on his person when shot witness had never heard of it.

Testifying in his own behalf, the defendant corroborated in detail the testimony of his wife which related to everything that occurred up to Tuesday evening—the evening before the shooting.   Referring to his interview with Hathaway when Hathaway requested him to leave the house, he said that he asked Hathaway if Wilson was not the man who told him, Hathaway, about the rumors of improper conduct on his and Miss Saunders's part.   His reasons for then suspecting Wilson as the author of the slanders was the conduct and language of Wilson on the night before— that is, the lighting of the matches and lamp, the pistol transaction, and Wilson's statement that he saw things going on in the house he didn't like; and the discovery of Mrs. Hathaway, Mrs. Roberson, and Mrs. Wilson (the latter in tears) closeted in Wilson's room on that morning.   The witness stated that in reply to Hathaway, after Hathaway refused to give his authority for the scandalous reports, he said: "Mr. Hathaway, I have known that young lady for some time.   If any man thinks I could be guilty of such a thing with her he does not know me; and if any man says that she is not as good and pure as his own wife and daughters, I say he is a damned liar, and you will do me a favor to tell him that I say so." Witness made no reply to Hathaway's suggestion to marry Miss Saunders, and did not tell him that he would adopt another means of protecting her reputation or character.   After this interview with Hathaway witness returned to Miss Saunders and told her what Hathaway had said.   Miss Saunders then said, "Mr. Wilson is at the bottom of this."   She then told witness, as she testified on this trial, what deceased did and said to her on the preceding night.   The shooting occurred on the next day.

The witness spent a part of the morning of August 8 hunting a board-

ing house. A short while before the shooting he started to the office of
the Dallas News, in which office he was a compositor. At or near the
Texas & Pacific Railroad depot and Aldridge's printing house the witness
met Mr. Rodgers, with whom he talked for a minute or two about a pro-
jected trip to Denver. Witness then asked Rodgers to walk down town
with him. Rodgers, who was Aldridge's engineer, then went into the
shop, put the machinery to work, and started to town with witness. From
back of Aldridge's building they went down Griffin Street, thence up Elm
Street, and thence traversed and crossed other streets to the News office.
On Elm Street the witness saw Wilson for the first time since Monday
night. He appeared to be following witness, and witness more than once,
en route to the News office, called Rodgers's attention to that fact. He
was behind witness and Rodgers, and crossed streets that they crossed.
Witness and Rodgers entered the office of the News through the door at
which the shooting presently occurred. At that time witness did not
know where Wilson was, as he had lost sight of him on another street.
Remaining in the office but a minute or two, the witness started to the
composing room, to reach which it was necessary to go out at the door
through which he had entered the building. Passing Rodgers, he walked
down the stairway, and was about to step out of the door when he came
suddenly face to face with Wilson, in the act of stepping into the door.
This sudden and unexpected meeting greatly excited the witness, and he
asked Wilson, in substance, "What is it you have to say about that young
lady?" Witness was uncertain that Wilson made any reply, but he sprang
backwards and threw his right hand to his hip pocket, or behind him, in
a manner indicating a purpose to draw a pistol, and the witness, believing
he was about to be shot by Wilson, drew his pistol and fired twice in rapid
succession. After the deceased fell witness gave his pistol to Eugene Kirk,
and hunted and found an officer, to whom he surrendered.

The defense next read in evidence the deposition of Eugene Kirk. The
important matter testified by him was that he witnessed the meeting of
Lane and Wilson at the time of the shooting. Lane was going out of and
Wilson apparently going into the door of the News office. Witness first
heard a voice, and was then nearly blinded by a shot from a pistol. He
then saw Wilson backing toward the sidewalk, with his hand at his hip
pocket in position to draw a pistol. Lane then fired again and Wilson
fell.

Rodgers's deposition was next read in evidence by the defense. The
witness corroborated the testimony of the defendant as to what transpired
from the time that he and defendant left Aldridge's until the shooting.
He added that when defendant called his attention to Wilson on Elm
Street, and said that he was following them, the defendant manifested
and expressed a desire to avoid meeting Wilson. The witness was present
and saw and heard what occurred at the time of the shooting. Lane and

Wilson met face to face suddenly, in the door. Lane said to Wilson, "You have been talking about my girl." Wilson replied either, "Have I," or "I have not." He, Wilson, then elevated his left hand and threw his right hand behind him. Instantly Lane, saying something witness did not understand, drew his pistol and fired two shots in quick succession. Wilson staggered and fell at the second shot.

Several witnesses, both for State and defense, testified that the defendant's reputation for peace and quietude was good.

Those parts of the charge of the court referred to in the opinion read as follows: * * * "Insulting words or conduct or words of the person killed towards a female relative of the party guilty of the homicide is deemed an adequate cause, but when it is sought to reduce the homicide to the grade of manslaughter by reason of such insulting words or conduct, it must appear that the killing took place immediately upon the happening of the insulting conduct or the uttering of the insulting words, or so soon thereafter as the party killing may meet with the person killed after having been informed of such insults.

"Any female under the permanent or temporary protection of the accused at the time of the killing shall be included within the meaning of the term relation. * * *

"If from the evidence you are satisfied beyond a reasonable doubt that in Dallas County, Texas, at any time within three years next before October 13, 1888, the defendant, S. E. Lane, did kill J. W. Wilson by shooting him with a pistol as charged, and you further find that such killing was done under the immediate influence of sudden passion (as that is above defined) arising from insulting words spoken or conduct offered by Wilson to Miss Barbara Saunders, and you further find that Miss Barbara Saunders was at the time the betrothed wife of the defendant Lane, and that Wilson was killed as soon as Lane met him after having been informed of such insults (if any) offered her, then you will find him guilty of manslaughter, and assess his punishment at confinement in the penitentiary for a term of not less than two years nor more than five years; and in this connection you are told that it is for you to determine whether under all the circumstances the insulting words or conduct of Wilson to Miss Saunders (if any) were the real cause which provoked the killing. But before the killing can be reduced to manslaughter you must believe from the evidence not only that the insults referred to had been offered, but that at the time of the killing the defendant's mind was so agitated by reason of a knowledge of this fact that he was rendered incapable of cool reflection."

*D. G. Wooten* and *I. R. Oeland,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WILLSON, JUDGE.—We are of the opinion,that the juror Brooks was not a householder and was disqualified to serve as a juror. A householder is one who is the head or master of a family; a person who occupies a house and has charge of and provides for a family therein. The term means something more than the mere occupant of a room or house. It implies the idea of a domestic establishment—the management of a household. It is not requisite that the person should be a married man. His family may consist of servants or others occupying the house with him, but he must be the head or master of the establishment. 9 Am. and Eng. Enc. of Law, p. 783, note 1; 1 Thomp. on Trials, sec. 53; Lester v. The State, 2 Texas Ct. App., 432.

In Robles v. The State, 5 Texas Court of Appeals, 346, it is stated that one who "rents a room and boards" is a householder. This statement is too broad, and must be taken subject to the qualifications above expressed. The facts of that case are not reported, and we are unable to say that the decision is wrong upon the facts, but we do say that the mere occupancy of a rented room and boarding does not constitute a person a householder. We hold that the court erred in concluding that Brooks was a householder upon the facts proved upon that issue.

But a majority of this court have held, and still hold, that the mere disqualification of a juror who served on the trial is not a good ground for a new trial. That to constitute it a good ground it must be made to appear that the service of such disqualified juror was calculated to injure the rights of the defendant, and did probably produce such injury. Leeper and Powell v. The State, *ante.*

In his motion for a new trial the defendant complains that the service upon the jury of said Brooks was calculated to and did injure his rights, in that the said Brooks favored and advocated a verdict finding the defendant guilty of murder in the first degree and assessing the punishment at death, while other jurors were in favor of finding lower degrees of homicide, and some were in favor of an acquittal. The motion for a new trial is supported by the affidavits of the defendant and his two counsel, but as to the conduct of the juror Brooks upon the jury the affiants are not specific in their statements, merely stating that the statements in the motion are true to the best of their information and belief, without stating the source and character of their information, from whom or how it was obtained, or any specific facts constituting the basis of their belief. It is not shown by the motion, by bill of exception, by affidavit, or otherwise that the allegations as to the conduct of Brooks were true, or that any one would have testified to their truth. For aught that appears from the record, the information received by defendant and his counsel as to Brooks's conduct may have been unfounded and false in toto, and Brooks may in fact have been one of the jurors who favored a verdict of acquittal. In the shape in which the matter is presented to us in the record, we are

unable to say that any injury probably resulted to the defendant because of Brooks's service upon the jury.

With respect to other jurors to whose qualifications the defendant objected, we are of the opinion that each and all of said jurors were qualified, and that the trial judge did not err in so holding. Grissom v. The State, 4 Texas Ct. App., 374; Post v. The State, 10 Texas Ct. App., 579; Ellison v. The State, 12 Texas Ct. App., 557; Steagald v. The State, 22 Texas Ct. App., 464; Bolding v. The State, 23 Texas Ct. App., 172.

Other exceptions made to the organization of the jury have been noticed and considered by us, but in our opinion they are immaterial and do not show error.

Numerous objections are made to the charge of the court, and to the refusal of the court to give special instructions requested by the defendant. We have given careful consideration to these several objections, and without taking time to discuss them in detail, we will merely say that we think the charge given is free from error unfavorable to the defendant, and is applicable to the facts of the case, and that there was no error in refusing any of the instructions requested by the defendant.

As we view the evidence, the only phase of it presenting the issue of manslaughter was submitted to the jury under proper instructions. If the insulting language and conduct by deceased towards the defendant's betrothed did not constitute adequate cause for the homicide, then there is no issue of manslaughter raised by the evidence. No other facts were proved which, either singly or collectively considered, would tend to support the theory of manslaughter. There is no evidence that the deceased intended to attack the defendant, or that the defendant had any good reason to apprehend an attack from him. Deceased had not said an unkind word to or about him; had made no threats against him; had been engaged in no quarrel or difficulty with him, and was but slightly acquainted with him. Deceased was walking upon the streets of Dallas, where his business called him and where he had a perfect right to be. He was unarmed. He was confronted suddenly by the defendant, and without warning, or the opportunity even to explain anything to the defendant, he was shot and killed by the defendant, who appeared calm and collected in the commission of the deed. In our judgment the evidence fully warrants the conviction, and would have sustained a conviction for murder in the first degree.

Other errors than those we have noticed have been assigned by the defendant, but none of them in our judgment exist, or if they do, are not of a material character.

Finding no reversible error, the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.